IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FIRST MARINER BANK,           *

    Plaintiff               *

    v.                      *        CIVIL NO.  MJG-12-1133

THE RESOLUTION LAW GROUP,     *
P.C., et al.,
                              *

    Defendants.             *

    *   *   *   *   *   *   *   *   *   *   *   *

## Report and Recommendation

Pending before the Court is First Mariner Bank's ("Plaintiff") motion for sanctions.  (ECF No. 238).  The Court has considered the motion, R. Geoffrey Broderick's and the Resolution Law Group's ("RLG") (collectively "Defendants") response in opposition (ECF No. 246), and Plaintiff's reply thereto (ECF No 251).  The Court held a hearing on the present motion, as well as Plaintiffs pending motion for entry of civil contempt order (ECF No. 202), on April 9, 2014.  (ECF No. 253). For the reasons discussed herein, it is the undersigned's recommendation that Plaintiff's motion for sanctions (ECF No. 238) be GRANTED and the sanction of default be entered against Defendants.[1]

_____

[1] On March 7, 2013, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302, Judge Garbis referred this case to the undersigned for all discovery and

## I. Background

Judge Garbis, in his memorandum order denying Defendants'
motion to dismiss (ECF No. 60), summarized the nature of
Plaintiff's claims against Defendants. Plaintiff has pled three
claims: false advertising in violation of the Lanham Act (15
U.S.C. § 1125(a)), unfair competition, and defamation. All of
Plaintiff's claims against Defendants are based on Defendant
Resolution Law Group's ("RLG") mail advertisements dated April
6, 2012 and May 3, 2012 (and possibly other dates) to certain of
Plaintiff's Maryland customers. These mailers stated that RLG
was investigating First Mariner, suggested (at minimum) that
First Mariner was engaging in illegal and improper banking
practices, and indicated that some banks were in settlement
negotiations with government agencies. The advertisements also
said that the government would seek monetary damages for

related scheduling matters. (ECF No. 72). Referral of a case to a
Magistrate Judge to resolve discovery matters pursuant to 28 U.S.C. §
636(b)(1)(A) and Local Rule 301.5.a authorizes the Magistrate Judge to order
any appropriate relief short of an order dispositive of one or more pending
claims or defenses. Any objection to such an order must be served and filed
within fourteen (14) days after service of the order. Local Rule 301.5.a.
(D. Md. 2011). If, however, a Magistrate Judge determines that a default
judgment is the appropriate remedy for discovery misconduct, the Magistrate
Judge must make findings and recommendations for action pursuant to 28 U.S.C.
§ 636(b)(1)(B) and Local Rule 301.5.b. When a Magistrate Judge issues a
Report and Recommendation, any objections by the parties must be served and
filed within fourteen (14) days after a copy of the proposed findings and
recommendations is served on the party wishing to object, pursuant to Fed. R.
Civ. P. 72(b). Local Rule 301.5.b. (D. Md. 2011). Judge Garbis referred
this matter to the undersigned for all discovery and related scheduling
matters, thus, to the extent that this memorandum orders non-dispositive
relief, it shall be pursuant to 28 U.S.C. § 636(b)(1)(A) and to the extent
that it recommends dispositive relief, it shall be pursuant to 28 U.S.C. §
636(b)(1)(B). In either case, the parties have fourteen (14) days in which
to serve and file objections to any aspect of this Report and Recommendation.
Local Rule 301.5 (D. Md. 2011).

individuals and reductions in home loans, principal balances, and interest rates. The mailers urged the recipients to contact RLG promptly.

Plaintiff maintains that RLG is operating a mass joinder mortgage reduction scam, similar to scams condemned in other jurisdictions. Plaintiffs allege that RLG's mailers are untrue and seek to scare recipients into engaging RLG (and paying a retainer) for non-existent mortgage reduction services and representation in a scam-lawsuit which RLG has no bona fide basis for filing ―― all to the considerable detriment of Plaintiff's business and goodwill.

## A. History of Discovery Misconduct

It is against the backdrop of these claims and factual allegations that Plaintiff first sought discovery from Defendants, serving Plaintiff's first discovery on Defendants on December 11, 2012. Dissatisfied with Defendants' response to Plaintiff's first set of interrogatories and requests for production of documents, on March 13, 2013, Plaintiff filed a motion to compel discovery. (ECF No. 73-1). Following a hearing, by letter memorandum and order, dated April 19, 2013, the Court agreed with Plaintiff, finding Defendants' answers to interrogatories to be totally unresponsive and largely boilerplate. (ECF No. 87). As such, the Court ordered Defendants to fully answer, by May 1, 2013, interrogatories Nos.

4 (all employees), 7 (cost of advertisement mailings), 10 (persons involved in creation, maintenance, funding, and domain registration), 11 (list and information regarding persons answering calls from recipients of mailed advertisements) and 14 (recordings and transcriptions of calls). (Id. at 2). The Court warned that "[f]ailure to [completely answer interrogatories] will subject defendants to additional sanction." (Id. at 1).

The Court similarly found many of Defendants' responses to Plaintiff's requests for production of documents "totally uninformative [and] boilerplate," noting that Defendants failed to actually produce any documents with their response. (Id. at 2). As such, the Court ordered Defendants to produce, by May 1, 2013, all documents sought in requests Nos. 1, 4, 5 and 6 (all advertisements including blanks and drafts), 7, 8 (contracts, including those with Marketing Smart and Register.com), 10, and 11 (scripts, training materials, including subject of fee amount). The Court likewise warned that "[f]ailure to produce all documents will subject Defendant[s] to additional sanction." (Id.)

The Court's April 19, Order also commanded, in order to assure that Plaintiff would receive all disseminated advertisements or drafts of the same, Mr. Ian Berger of RLG to submit an affidavit "attaching all advertisements, explaining

and attesting to the fact that these represent the universe of advertisements and drafts." (Id.). Additionally, the Court further ordered production of "a complete list of recipients of defendants' advertisements" (under cover of Berger's affidavit), a list of RLG employees to date and a "viable address" for Defendants' marketing firm (also under cover of Berger's affidavit) and finally that Mr. Berger should state in his affidavit that he "has attempted to obtain a current, valid address [for the marketing firm] and list those attempts." (Id.).

Finding no substantive justification for Defendants' discovery failures, the Court's April 19, Order awarded expenses to Plaintiff. (Id.).

By letter motion dated May 2, 2013 (ECF No. 91), Plaintiff complained that Defendants had failed to comply with the Court's April 19, 2012 Order. As such, the Court held a hearing on May 21, and agreed that Defendants had significantly failed to comply, as delineated in the telephone hearing, and thus, ordered Defendants to file, by June 5, 2013, supplemental answers to interrogatory Nos. 4 (all employees), 7 (cost of advertisement mailings), 8 (selection of recipients of mailed advertisements), 10 (persons involved in creation, maintenance, funding and domain registration), 11 (list and information regarding persons answering calls from recipients of mailed

advertisements), 14 (recordings and transcriptions of calls); supplemental responses to request Nos. 5 and 6 (all advertisements including blanks and drafts), 7 (contracts including with Marketing Smart and Register.com), 10 (scripts, training materials, including subject of fee amount); and supplementation to the Berger affidavit, paragraph Nos. 3 (failure to attach all Advertisements, including blanks and drafts, with attestation that those attached are the universe of advertisements), 7 (failure to give specifics of effort to identify valid address for Marketing Smart), and 8 (failure to obtain lists of recipients from Marketing Smart). (ECF No. 105). Further, the Court ordered that these supplemental answers and responses must be signed by both Mr. Kirk and Mr. Calhoun as counsel and both Mr. Berger and Mr. Broderick as representatives of RLG and that the supplemental affidavit be signed by both Mr. Berger and Mr. Broderick.

By letter dated June 6, 2013, Plaintiff again advised the Court that Defendants had failed to comply with the May 22, Order. In response, by letter order dated June 13, 2013 (ECF No. 121), the Court asked Plaintiff's counsel to specifically identify remaining discovery deficiencies and instructed Defendants' counsel "to carefully review my past letter orders and the plaintiff's counsel's complaint regarding lack of compliance [and warned that] [c]ontinued failure to respond

completely may result in additional sanctions, up to and including entry of default judgment on any claims negatively affected by the failure of discovery." (Id.) (emphasis added). The Court held a hearing on June 24 and once again found continued failure to satisfactorily respond, including failure to answer certain interrogatories, notably interrogatory Nos. 4 (all employees), 8 (selection of recipients of mailed advertisements), 10 (internet website consultant), 11 (list and information regarding persons answering calls of recipients of mailed advertisements), and 14 (recordings and transcripts of calls); failure to answer certain requests for documents, notably documents Nos. 5 and 6 (all drafts of advertisements), 7 (contracts with Marketing Smart, Register.com and other vendors), and 10 (scripts, training materials, etc.); and continued failure to provide the ordered affidavit statements on the universe of advertisements and drafts, an adequate address for Marketing Smart to allow service of a subpoena, lists of recipients associated with specific advertisements, and an attestation that lists are the universe of persons who received advertisements (A list of recipients was first produced literally during the discovery hearing on June 24, though the list was not associated with any particular mailing).

Following the June 24, hearing, the Court issued a letter memorandum and order, dated July 3, 2013, allowing that

Defendants could "still cure the [above noted] deficiencies, which may lessen the sanction" imposed for its discovery violations to date. (ECF No. 140). However, the Court "determined to award additional attorney's fees (as set forth by Plaintiff's counsel in ECF No. 123 and to which Defendant has not responded)" and ordered briefing as to any further sanctions. (Id.). As directed, Plaintiff filed its motion for sanctions on July 15, 2013. (ECF No. 142). On July 31, 2013, Defendants served on Plaintiff their supplemental discovery responses, addressing the deficiencies outlined in the Court's July 3, Order, and responded with a memorandum opposing Plaintiff's motion for additional sanctions. (ECF No. 143).

By memorandum opinion, dated October 24, 2013, the Court determined that sanctions were warranted for Defendants' discovery misconduct to date. (ECF No. 160). The Court's memorandum opinion discussed, in detail, Defendants' obstreperous discovery misconduct and evaluated Defendants' failures in the context of the Fourth Circuit's four-factor standard for assessing appropriate sanctions.[2] First, as to factor-one, "the history of Defendants' discovery misconduct

---

[2] Courts in the Fourth Circuit must consider four factors in determining what sanctions to impose for a party's discovery misconduct: (1) whether the non-complying party acted in bad faith; (2) the amount of prejudice that noncompliance caused the adversary; (3) the need for deterrence of the particular sort of non-compliance; and (4) whether less drastic sanctions would have been effective. Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003)(quoting Anderson v. Found. For Advancement, Educ. & Employment of Am. Indians, 155 F.3d 500, 504 (4th Cir. 1998)).

overwhelmingly demonstrates the Defendants' bad faith." (Id. at 20). Second, as to factor-three and factor-four, the Court determined the "need for deterrence is great" for the type of meritless non-compliance exhibited by Defendants and "quite obviously, the previous monetary sanction of an award of expenses was ineffective." (Id. at 21). The more difficult question involved factor-two, "the nature and extent of prejudice that First Mariner suffered and suffers by Defendants' discovery misconduct, and the appropriate relief for that prejudice." (Id. at 22). The Court found both procedural prejudice —— evasiveness, delay, and obfuscation hindering a party's ability to develop its case, a "death by a thousand cuts" approach to legitimate discovery requests —— as well as substantive prejudice —— hindering a party's ability to prosecute a claim or present evidence at trial. Following Defendants' July 31 supplemental discovery disclosure, the Court acknowledged that the prejudice to date was largely procedural given that Defendants eventually produced much of the requested discovery (or swore that it did not exist —— sometimes with questionable credibility), with the important exceptions of the denial of information regarding Marketing Smart and the lack of identification of past employees. (Id. at 27-28). Accordingly, by amended order, dated December 4, 2013, the Court ordered the following sanctions against Defendants:

[T]hat defendants are liable to plaintiff for attorney's fees in the amount of $23,221.00 and shall pay plaintiff this amount by December 13, 2013;

[T]hat the following jury instruction be given at the trial of this case:

> Through the course of discovery, the court found that defendants delayed in providing complete information about RLG's operations, personnel and procedures, the development of mailed advertisements, and the selection of targeted recipients of the mailed advertisements. While defendants eventually provided much of the requested information, defendants' delay impeded plaintiff's effort to develop evidence to support its allegation that defendant RLG is not offering legitimate legal services.

> Accordingly, you may consider this conduct by defendants along with all of the other evidence presented, during trial, in deciding the issues presented for your determination in this case.

[T]hat defendants may not introduce any further evidence on their costs of the mailed advertisements, beyond the per piece cost provided.

[T]hat defendants shall provide plaintiff with the contact information for all persons identified in answers to interrogatories nos. 4 and 11 and for Gary L. Kit Wright, Bill Goodman and Brian Maller by December 11, 2013.

(ECF No. 191).

On December 16, 2013, Plaintiff filed its motion for entry of civil contempt order (ECF No. 202), following Defendants' failure to pay the $23,221.00 attorney's fees sanction by the

December 13, 2013 deadline. On February 21, 2014, the Court held a hearing on Plaintiff's motion and found Defendant Broderick in civil contempt, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vii). (ECF No. 252). An additional hearing as to the appropriate remedy for Defendant Broderick's contempt was held on April 9, 2014. (ECF No. 253). According to a status report filed by Defendants on April 15, 2014, Defendants have finally paid the $23,221.00 sanction imposed pursuant to the Court's December 4, Order. (ECF No. 255). The Court has now received verification of that payment.

**B. Present Discovery Dispute**

On March 7, 2014, Plaintiff filed its second motion for sanctions following further alleged discovery misconduct by Defendants. (ECF No. 238). Specifically, Plaintiff asserts three bases for additional sanctions: (1) spoliation of evidence, (2) failure to respond to interrogatories, and (3) failure to adequately prepare RLG's Rule 30(b)(6) designee, Defendant Broderick, for deposition. (Id. at 3).

Regarding Plaintiff's interrogatories, on November 22, 2013, Plaintiff served identical sets of 3 interrogatories on Defendants, seeking information about Defendants' revenue and net profits associated with advertisements pertaining to First Mariner and the costs incurred by Defendants in pursuing lawsuits against First Mariner in New York, New Jersey, and any

11

other location. (ECF No. 238-5). At the time Plaintiff filed its motion for sanctions, March 7, 2014, Defendants had not responded. Defendants responded to Plaintiff's interrogatories contemporaneously with filing Defendants opposition to Plaintiff's motion for sanctions (four-months after first receiving Plaintiff's interrogatories). (ECF No. 246, 23). Plaintiff's reply brief objects to the adequacy of Defendants' interrogatory responses, asserting that Defendants' responses raise boilerplate objections and respond evasively. (ECF No. 251, 6-7).

As to Mr. Broderick's preparation for his deposition, on December 18, 2013, Defendant Broderick was deposed in his individual capacity and as RLG's Rule 30(b)(6) corporate designee. (ECF No. 238-2; ECF No. 238-3). Plaintiff's Rule 30(b)(6) notice identified thirty six (36) topics for examination for Mr. Broderick's deposition (ECF No. 238-2, 6-9). Topics included, for example, "the identity of any person [RLG] represent[s] in the lawsuits [against First Mariner] that [RLG] claim[s] has an action against [First Mariner]," "payments from the plaintiffs of the lawsuits [against First Mariner] and the terms of engagement," "[RLG] offices, including staff, support, and record keeping," and "the maintenance of [RLG] books and records, including without limitation document and e-mail retention and destruction policies." (ECF No. 238-2). A review

of the transcript excerpts of Mr. Broderick's deposition illustrates the sort of responses given by Mr. Broderick on these topics, for example:

> Q. What if any document retention policy does the Resolution Law Group have?
>
> A. I'm not aware of the particular policy for documents.
>
> Q. Do you know if one exists?
>
> A. No, I'm not sure.

(ECF No. 238-4, 7).

> Q. You don't know if The Resolution Law Group has 1099 forms for independent contractors it has worked with?
>
> A. It might, but I don't know for sure, sorry.
>
> Q. Where would you look for that information?
>
> A. I -- I don't know -- I don't know if we 1099'd or whom we've 1099'd
>
> Q. I'm not asking who right now. I want to know if you've ever provided a 1099 form to an independent contractor working with the resolution Law Group.
>
> A. I don't know for sure.
>
> Q. Where would the 1099 form be kept by The Resolution Law Group?
>
> A. I don't know. That's a good question. I'm not sure.

(Id. at 9-10).

Q.   What   services   have   accountants   provided   the
Resolution Law Group?

A.   I  don't  know  exactly  what's  the  services,  what
was performed and what was not performed.

Q.   Where  were  the  accountants  located  who  performed
services for the Resolution Law Group?

A.   I'm  not  sure.  I  know  over  the  past  couple  of
years  we've  used  a  couple  of  different  accountants.
I'm  not  sure  exactly  where  they're  located,  if  they
had  their  own  office  or  if  they  working  out  of  one  of
the  offices.  I'd  have  to  look  into  that.  I'm  sorry.  I
don't know the answer.

(Id. at 10-11).

Q.   With  respect  to  number  18,  "Costs  incurred  by  you
in   pursuing   the   lawsuits,"   what   inquiry   did   you
undertake  to  determine  that  you  are  the  person  that
can  respond  to  questions  on  that  topic  --  on  behalf  of
The Resolution Law Group.

A.   I  didn't  do  any  inquiry.  I  just  figured  you  had
if  you  had  any  concerns  about  it,  you'd  discuss  it
with me, like the other questions.

(Id. at 36).

Q.   Number  32  "the  maintenance  of  your  books  and
records,  including  without  limitation  documents  and
email   retention   and   destruction   policies."   What
inquiry  did  you  undertake  that  you  were  the  best
person to respond to questions on that topic?

A.   I did not inquire into that, I'm sorry.

Q.  You didn't make any inquiry. You don't know if there's any document retention policy, you've testified to that earlier; correct?

A.  Right, that's correct.

Q.  And you don't know where, if at all, The Resolution Law Group maintains business records?

A.  That's correct.

(Id. at 40).  Mr. Broderick similarly could not identify where, or if, RLG maintains client files for a client represented by RLG in a federal "mass tort action" in the Eastern District of New York (Case No. 1:12-cv-04686):

Q.  You don't have a file for Mr. Abraham?

A.  I don't know the extent to which Mr. Abraham has a file.

(Id. at 39).  Moreover, Mr. Broderick refused to answer any questions pertaining to RLG finances, invoking the Fifth Amendment approximately forty (40) times in response to questioning on topics such as whether RLG has paid any filing fees in connection with mass-tort lawsuits against First Mariner or other banks, how much money RLG has received from plaintiffs it purports to represent in mass-tort actions, and how much RLG paid Marketing Smart in connection with marketing RLG services. (Id. at 31-40).

Finally, as to alleged spoliation of evidence, during Mr. Broderick's December 18, deposition, Mr. Broderick admitted that

"a few months" prior to his December deposition (in the midst of discovery) or "around the summertime," he "disposed of" the laptop he used in connection with RLG business. (ECF No. 238-4, 16-18). Mr. Broderick acknowledged that the discarded laptop was, in fact, the only computer he used for RLG business for several years prior to its alleged "crash." (Id. at 18). However, Mr. Broderick refused (or was unable) to identify what efforts he actually undertook to recover the computer's hard drive or even where he actually "disposed of" or "recycled" the device. (Id. at 18-22). For example, Mr. Broderick described his alleged recovery efforts as follows:

Q. Who did you ask about that?

A. I don't know. I'm remembering when I bought -- I don't know if I went to Office Depot, Office Max or Staples. Wherever I bought the new computer, I probably consulted with the team, the tech team, at the store about it. I would imagine that's what I would have done.

Q. Did you consult with - you would imagine. Do you know if you did that?

A. No, I don't remember exactly what I -- I remember doing -- trying to do everything that I could to recover the old laptop.

Q. And you described a conversation that you maybe had with someone at an Office Depot, but you don't know if that happened?

A. No, I -- I talked with -- I went and shopped at a few different stores for a new laptop, and I think

16

each time I was – at the facility I asked them about hard drive recovery, what, if anything, can be done from a hard drive that's fried. And I don't remember what the outcome was, but I was not able to recover anything from the –- from the laptop unfortunately.

Q.   Anything else you do in an effort to recover that?

A.   Nothing else that I know about, that I can remember. I believe I did everything I could.

(Id. at 20-21).  Additionally, when questioned about where he actually discarded the "old" laptop, Mr. Broderick stated as follows:

Q.   And where did you discard that laptop?

A.   I don't remember if it was Office Max, Office Depot or Staples, because I've used all three, and –- it depends where I bought the new one. I makes sense for me to have done it, but I've recycled stuff before so I – I don't know which exact facility it was.

Q.   It may have been the facility where you purchased the new laptop?

A.   Yeah. It could have been there, absolutely.

(Id. at 22).  Mr. Broderick did not discuss with anyone the fact that his laptop crashed or that he disposed of it.  (Id. at 24-25).  Mr. Broderick also admitted during his deposition to disposing of the "smartphone" he used in connection with RLG business only "a few weeks" prior to the deposition:

Q.   What did you end up doing with that phone?

A.   Recycled. When you get a new phone, you trade in your old one.

Q.   So you traded in that phone for a new one?

A.   Right

Q.   And that would have been done a couple weeks ago?

A.   I believe it's been a few weeks or a month, something like that.

Q.   And where was that done?

Q.   Sprint. Just sent my phone in. I don't know where it went.

(Id. at 29-30).

## II. Discussion

In light of Defendants' history of discovery abuse, Plaintiff's present motion for sanctions seeks the extreme remedy of entry of judgment by default. (ECF No. 238, 2). Fed. R. Civ. P. 37 grants the district court wide discretion to impose sanctions for a party's failure to comply with its discovery orders, including entry of default judgment. See, e.g., Mutual Fed. Sav. & Loan Ass'n v. Richards & Assoc., Inc., 872 F.2d 88, 92 (4th Cir. 1989); e.g., Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians, 155 F.2d 500, 504 (4th Cir. 1998). Similarly, district courts have the "inherent power" to sanction a party, including entry of default or

dismissal of an action, when a party abuses the judicial process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process. Projects Mgmt. Co. v. Dyncorp Int'l, LLC, 734 F.3d 366, 373-74 (4th Cir. 2013) (citing U.S. v. Shaffer Equipment Co., 11 F.3d 450, 465 (4th Cir. 1993)). When a sanction involves judgment by default, however, the district court's "range of discretion is more narrow" because the district court's desire to enforce its discovery orders or uphold the integrity of the judicial process is "confronted head-on by the party's rights to a trial by jury and a fair day in court." Mutual Fed. Sav., 872 F.2d at 92 (quoting Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 503-04 (4th Cir. 1977)); see also Projects Mgmt., 734 F.3d. at 373-74. As such, the Court turns first to consider whether the conduct alleged in the present motion warrants sanction, and if so, whether the sanction of judgment by default is appropriate in this case.

## A. Motion for Sanctions

The Plaintiff identified three (additional) incidents of discovery misconduct in its motion. Each will be addressed in turn.

### i. Spoliation of Evidence

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property

for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001)(citations omitted). A party's "failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." Goodman v. Praxair Services, Inc., 632 F. Supp.3d 494, 505 (D. Md. 2009); see also Thompson v. U.S. Dept. of Health and Urban Development, 219 F.R.D. 93, 100 (D. Md. 2003). The district court's authority to impose sanctions against a party for spoliation of evidence derives from two primary sources. See United Medical Supply Co., Inc. v. U.S., 77 Fed.Cl. 257, 264-65 (2007). First, courts possess the "inherent power" to control the judicial process and litigation to the extent necessary to redress conduct which abuses the judicial process. Silvestri, 271 F.3d at 590 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)). Second, if spoliation violates a court order or disrupts the court's discovery plan, Fed. R. Civ. P. 37 grants courts wide discretion to impose appropriate sanctions. See Mutual Fed. Sav., 872 F.2d at 92; Anderson, 155 F.2d at 504; Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 517 (D. Md. 2010). Here, Plaintiff has not identified any order of this Court violated by Defendants' alleged spoliation of evidence (the destruction of Defendant Broderick's laptop computer and

smartphone).  Thus, the Court's authority to sanction Defendants must derive from the Court's inherent power to regulate the judicial process.

In this Circuit, to prove sanctionable spoliation, a party must show that:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

Victor Stanley, 269 F.R.D. at 520-21 (quoting Goodman, 632 F. Supp.2d at 509); accord Silvestri, 271 F.3d at 591, 593-94.

### (1)  Duty to Preserve Evidence

The Court's first consideration is whether the alleged spoliator had a duty to preserve the lost or destroyed evidence and whether he or she breached that duty.  Once a party reasonably anticipates litigation, it is obligated to suspend its ordinary document retention and/or destruction policies and implement a "litigation hold" to ensure the preservation of relevant documents.  Silvestri 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but

also extends to that period before litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") (citation omitted); Goodman, 632 F. Supp.2d at 511. "Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence." Turner v. U.S., 736 F.3d 274, 282 (4th Cir. 2013) (citing Victor Stanley, 269 F.R.D. at 522)). This duty arises regardless of whether the organization is the initiator or the target of the litigation and includes an obligation to identify, locate, and maintain evidence which may be relevant to anticipated litigation. Victor Stanley, 269 F.R.D. at 521-22 (citation omitted).

Here, Defendant Broderick refused (or was unable) to provide the actual date on which he "disposed of" his laptop computer, stating instead, that he disposed of the computer "a few months ago" or "around the summertime I think." (ECF No. 238-4, 16-17). Accordingly, it is unclear precisely when Defendant Broderick destroyed the laptop computer, but his testimony indicates that the alleged spoliation occurred well into factual discovery and even after this Court's April 19, May 22, and July 3, Orders compelling production of documents, responses to interrogatories, and awarding fees. Mr. Broderick is the owner and founder of Defendant RLG and is himself a named defendant in this case. Clearly, in the middle of factual discovery, Mr. Broderick had a duty to implement a "litigation

hold" and preserve potentially relevant electronic evidence and documents. When Mr. Broderick "disposed of" or "recycled" his laptop computer, he put any relevant evidence contained therein forever out of the reach of Plaintiff and forestalled any meaningful attempts, by either party, to recover documents on the computer's hard drive. Accordingly, Mr. Broderick had a duty to preserve the potentially relevant evidence contained on his laptop computer, which he violated when he disposed of the device.

Mr. Broderick similarly disposed of his smartphone only "a few weeks" prior to his December, 2013, deposition. Again, the timing of this alleged spoliation clearly fits within the period when Defendant Broderick, for himself and for RLG, had a duty to preserve potentially relevant evidence, including potentially relevant electronic evidence.

Defendants' duty to preserve is beyond question as to both the laptop and the smart-phone.

### (2) Culpability

The second consideration for resolving alleged spoliation of evidence is to determine whether the alleged spoliator acted culpably. The Fourth Circuit recently clarified the culpable state of mind required for a finding of spoliation:

> Spoliation does not result merely from the negligent loss or destruction of evidence. <u>Vodusek v. Bayliner Marine Corp.</u>, 71 F.3d 148, 156 (4th Cir. 1995).

> Rather, the alleged destroyer must have known that the
> evidence was relevant to some issue in the anticipated
> case, and thereafter willfully engaged in conduct
> resulting in the evidence's loss or destruction. <u>See
> id.</u> Although the conduct must be intentional, the
> party seeking sanctions need not prove bad faith.  <u>Id.</u>

<u>Turner</u>, 736 F.3d at 282. Thus negligence – even gross negligence – is insufficient.[3] However, intentionality is sufficient, even in the absence of bad faith.

Willful conduct is equivalent to conduct that is intentional, purposeful, or deliberate. <u>Buckley v. Mukasey</u>, 538 F.3d 306, 323 (4th Cir. 2008); <u>Vodusek</u>, 71 F.3d at 156. Willfulness is established when a party "knew the evidence was relevant to some issue at trial" and his or her intentional, purposeful, or deliberate conduct resulted in its loss or destruction. <u>Vodusek</u>, 71 F.3d at 156. Conversely, "bad faith" requires "destruction for the purpose of depriving the adversary of the evidence." <u>Victor Stanley</u>, 269 F.R.D. at 530 (quoting <u>Powell v. Town of Sharpsburg</u>, 591 F. Supp.2d 814, 820 (E.D.N.C. 2008)).

Here, the Court finds Mr. Broderick's conduct constitutes bad faith. Defendants have obfuscated and obstructed discovery

---

[3] Compare <u>Victor Stanley</u>, 269 F.R.D. at 529 (finding that "[i]n the Fourth Circuit, for a court to impose some form of sanctions for spoliation, any fault – be it bad faith, willfulness, gross negligence or ordinary negligence – is a sufficiently culpable mindset" and noting that "[u]nder existing case law, the nuanced, fact-specific differences among these states of mind become significant in determining what sanctions are appropriate") (citation omitted).

in this case at every opportunity and, to date, have been reprimanded with multiple attorney's fees sanctions, adverse jury instructions, and preclusion of additional evidence at trial relating to particular issues. Mr. Broderick is himself a lawyer, and it is baffling to the Court that a lawyer (particularly one, such as Mr. Broderick, who has filed federal mass-tort actions in multiple jurisdictions and collected approximately $2.6 million dollars in fees from clients tied to those lawsuits) would not understand the concept of a "litigation hold" and would not know that his only work computer and smartphone were instruments relevant to the present litigation.

Moreover, "'the volume and timing' of Defendants' spoliation is telling." See Victor Stanley, 269 F.R.D. at 531. In the very middle of factual discovery, Mr. Broderick "recycled" his laptop computer and smartphone, unequivocally rendering any and all information on either device unrecoverable. Mr. Broderick's utterly uninformative and inconsistent description of the steps he took to recover his laptop's "crashed" hard drive is shocking and devoid of credibility, raising the question whether Mr. Broderick actually took any legitimate steps to recover data:

> Q. No[w] what attempts did you make to recover records or any -- any records that were on the laptop you discarded?

A.   I made every attempt I could to try to recover
the hard drive ... Everything pretty much fried, so I
did what I could to try to recover it. I don't
remember, but I thoroughly went through it to see if
there was any chance of me trying -- I didn't want to
have to buy another laptop ...

Q.   Did you consult with any computer expert about
the laptop?

A.   I don't remember if I did or not where I bought
the new one. I may have to -- I don't remember exactly
what exactly I went through in trying to recover. I
made a very diligent effort in trying to do what I
could to save any information ...

Q.   And what efforts were those?

A.   Just trying to go through the hard drive just to
see if there was anything that was left of it.
...
Q.   And you --

A.   I think when I brought -- when I bought the --
the new one I -- when I went, took the old one to be
recycled, I believe we did everything that we could to
see if there was any way of being able to transfer
anything off of the old computer onto the new one just
so I wouldn't lose files. Also to make it obviously a
lot more convenient in the transition process from the
old to the new. And there was -- I believe all efforts
to that was futile.

Q.   Who did you ask about that?

A.   I don't know. I'm remembering when I bought -- I
don't know if I went to Office Depot, Office Max or
Staples. Wherever I bought the new computer, I
probably consulted with the team, the tech team, at

the store about it. I would imagine that's what I would have done.

Q. Did you consult with -- you would imagine. Do you know if you did that?

A. No, I don't remember exactly what I -- I remember doing -- trying to do everything that I could to recover the old laptop.

Q. And you described a conversation that you maybe had with someone at Office Depot, but you don't know if that happened?

A. No, I -- I talked with -- I went and shopped at a few different stores for a new laptop, and I think each time I was -- at the facility I asked them about hard drive recovery, what, if anything, can be done from a hard drive that's fried. And I don't remember what the outcome was, but I was not able to recover anything from the -- from the laptop unfortunately.
...
Q. So you traded in that phone for a new one?

A. Right

Q. And that would have been done a couple weeks ago?

A. I believe it's been a few weeks or a month, something like that.

Q. And where was that done?

Q. Sprint. Just sent my phone in. I don't know where it went.

(ECF No. 238-4, 18-21, 29-30). This apparent amnesia relates to events which occurred, not years before, but from his own testimony, three to six months before. In fact, despite Mr.

Broderick's refusal to accurately identify when he destroyed his laptop computer, his testimony indicates that he destroyed the computer _after_ this Court's July 3, Order (ECF No. 140) compelling discovery from Defendants and allowing Plaintiff leave to seek sanctions for Defendants' discovery misconduct to date. The timing of Mr. Broderick's destruction of the smartphone is arguably even more telling, occurring only a "few weeks" prior to Mr. Broderick's December, 2013 deposition and _after_ this Court awarded the aforementioned sanctions to Plaintiff (ECF No. 160).

Defendants' opposition to Plaintiff's present motion for sanctions offers no clarification or justification for Mr. Broderick's actions. Unlike _Goodman_, 632 F. Supp.2d at 503-04, 522-23 (finding willful spoliation of evidence where the defendant intentionally destroyed a "key player's" computer by reimaging and repurposing the computer during the corporation's "ordinary course of business as technology became outdated"), Mr. Broderick's computer and smartphone were not destroyed pursuant to some RLG technology updating and/or repurposing program. Rather, Mr. Broderick purposefully and intentionally disposed of both devices with no rational justification. As was the case in _Victor Stanley_, 269 F.R.D. at 531, Mr. Broderick's conduct rises to the level of bad faith. Mr. Broderick disposed of his computer and smartphone despite his knowledge of the

present lawsuit – indeed pending discovery requests -, has provided incoherent, inconsistent and wholly unbelievable explanations for his actions, and has offered no rational justification for the same – all against the backdrop of Defendants' obstreperous conduct throughout discovery in this case and incessant attempts to avoid producing discoverable information. See also Barette Outdoor Living, Inc. v. Michigan Resin Representatives, No. 11-13335, 2013 WL 3983230, at * (E.D. Mich. Aug. 1, 2013)(awarding spoliation sanctions where the defendant acted in bad faith by using a scrubbing software to wipe files from his personal laptop and discarded his cell-phone by turning it into Sprint). The Court will not turn a blind eye to this egregious conduct committed in the midst of discovery.

### (3) Relevance and Resulting Prejudice

Lastly, the Court must consider the relevance of the lost evidence and the resulting prejudice. "Relevance" for purposes of spoliation is a "two-pronged" finding of (1) relevance and (2) prejudice. Victor Stanley, 269 F.R.D. at 531-32. In this context, evidence is "relevant" if "a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." Id. at 531; Goodman, 632 F. Supp.2d at 509; Thompson, F.R.D. at 101.

Spoliation results in prejudice if, as a result of the spoliation, the non-spoliating party's ability to present its

claim or defense is compromised or the spoliator's conduct was so egregious as to amount to a forfeiture of its claim or defense. See Silvestri, 271 F.3d at 593 (finding, "at bottom," the harsh sanction of dismissal is warranted where a court is able to conclude either "(1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim); Victor Stanley, 269 F.R.D. at 532 ("Generally, court's find prejudice where a party's ability to present its case or defend is compromised.")(citations omitted). Moreover, courts in this Circuit recognize that "[w]hen the party alleging spoliation shows that the other party acted willfully in failing to preserve evidence, the relevance of that evidence is presumed." Victor Stanley, 269 F.R.D. at 532 (citing Sampson, 251 F.R.D. at 179; Thompson, 219 F.R.D. at 101). Accordingly, because the Court finds that Defendants acted not only willfully but with bad faith by spoliating evidence contained on Mr. Broderick's laptop computer and smartphone, the Court presumes the relevance of the evidence contained therein.[4] Thus, the

---

[4] Defendants' opposition to Plaintiff's motion for sanctions raises the fact that Mr. Broderick claimed during his deposition that he did not use his discarded smartphone's email function (ECF No. 246, 23; ECF No. 238-4, 30). However, this argument reaffirms the very rationale for the presumption of relevance following willful or bad faith spoliation of evidence, as the non-spoliating party is left with no recourse to test or challenge the veracity of a claim that lost evidence was nonexistent or had no relevance. See Sampson, 251 F.R.D. at 197 ("the reason relevance is presumed following a

Court shall move to the second step, consideration of the resulting prejudice and what sanctions shall apply.

Plaintiff asserts that it has been manifestly prejudiced by Defendants' spoliation of Mr. Broderick's laptop computer and smartphone, because Defendants have refused to identify the whereabouts of any RLG business records and, to date, Mr. Broderick's laptop and smartphone are the only items unequivocally identified as used in connection with RLG business. (ECF No. 238-1, 15). Defendants respond with the puzzling argument that, because Plaintiffs did not ask Mr. Broderick "the most important question: [w]hat specific documents were on the cell phone and laptop computer?" it is impossible to determine relevance or prejudice. (ECF No. 246, 23). The Court disagrees with Defendants' position, as explained supra, because of Mr. Broderick's bad faith conduct, relevance is presumed.

Here, Defendants' obstruction of the discovery process regarding RLG business records is stark. Defendants have not produced any RLG business records to date and during Mr. Broderick's deposition, wherein he was deposed in his individual capacity and as RLG's Rule 30(b)(6) designee, he claimed

---

showing of intentional or willful conduct is because of the logical inference that, when a party acts in bad faith, he demonstrates fear that the evidence will expose relevant, unfavorable facts.")(citing Vodusek, 71 F.3d at 156).

absolutely no knowledge of the whereabouts or existence of any records maintained by RLG:

Q.   You mentioned "client files." Are there any other business records maintained at the Las Vegas --

A.   I'm just guessing at the files. I'm not sure what files there are. I'm just speculating that there might be client files. I don't know if they -- he keeps files there or we keep files on a different location or if they outsource the use, space for files, that -- I haven't had to conversation with him.
...
Q.   What business records, if any, does The Resolution Law Group maintain at the Connecticut office?

A.   I'm not aware of any records being kept there.
...
Q.   What if any document retention policy does The Resolution Law Group have?

A.   I'm not aware of the particular policy for documents.

Q.   Do you know if one exists?

A.   No, I'm not sure
...
Q.   You were describing your home office. Do you maintain any business records of The Resolution Law Group at the home office?

A.   No, not that -- I don't believe I have any records

Q.   Do you have any files relating to The Resolution Law Group at your home office?

A.   No, I don't believe I have any files there.
...

Q. And you don't know where, if at all, The Resolution Law Group maintains business records?

A. That's correct.

(ECF No. 238-4, 3, 4-5, 25-26, 40). It is obvious that the permanent loss of the only identified sources of information into the operations of RLG prejudices Plaintiff's ability to present its case. Here, much of Plaintiff's case is premised on the theory that RLG is not a legitimate law firm, and thus, had neither the capacity nor the intention of bringing any bona fide lawsuits on behalf of the recipients of its mailers. Evidence pertaining to these issues is of particular importance to Plaintiff's false advertising and unfair competition claims. Accordingly, prejudice resulting from this loss of evidence is severe, and it is left to the Court to determine what sanction is appropriate.

While a district court has broad discretion in choosing an appropriate sanction for spoliation, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Silvestri, 271 F.3d at 590 (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2nd Cir. 1999)). "The harshest sanctions may apply not only when both severe prejudice and bad faith are present, but also when, for example, culpability is minimally present, if there is a considerable showing of

prejudice, or, alternatively, the prejudice is minimal but the culpability is great" _Victor Stanley_, 269 F.R.D. at 533; _Silvestri_, 271 F.3d at 593 (finding that severe sanctions, including dismissal, are "usually justified only in circumstances of bad faith or other 'like action' ... [b]ut even when conduct is less culpable, dismissal may be necessary if the prejudice to the [non-spoliating party] is extraordinary, denying it the ability to adequately defend [or present] its case") (citing _Cole v. Keller Indus., Inc._, 132 F.3d 1044, 1047 (4th Cir. 1998)).[5] With these principles in mind, the Court will address Defendants' other sanctionable conduct before turning to what sanctions are appropriate at this stage of the case.

### ii. Duty to Designate and Prepare a Rule 30(b)(6) Witness

A corporation noticed pursuant to Fed. R. Civ. P. 30(b)(6) is compelled to comply and may be ordered to designate witnesses

---

[5] The Court also notes that the authority to impose sanctions for spoliation derives from court's "inherent power" to uphold the integrity of the judicial process and fashion the appropriate sanction for conduct that disrupts the same. _Silvestri_, 271 F.3d at 590 (citing _Shaffer Equip. Co._, 11 F.3d at 450). Thus, before entering the "most extreme sanctions," _i.e._ dismissal without considering the merits or entry of judgment by default, a court must also weight the following factors: "(1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest." _Projects Mgmt._, 734 F.3d at 373-74 (quoting _Shaffer Equipment_, 11 F.3d at 462-63). Analysis of the defendants' actions under these factors likewise compels imposition of a severe sanction. Like obstruction of justice in a criminal case, destruction of evidence in a civil case strikes at the heart of our system of the rule of law. Whether witness intimidation in a criminal case or destruction of evidence in a civil case, the perpetrator takes the law into his own hands, hoping to disable the system from reaching a decision on the merits.

if it fails to do so. 8A Charles A. Wright, Arthur R. Miller,

et al., <u>Federal Practice & Procedure</u> § 2103, at 453-54 (3d ed.

2010).

> The goal of the Rule 30(b)(6) requirement is to enable
> the responding organization to identify the person who
> is best situated to answer questions about the matter,
> or to make sure that the person selected to testify is
> able to respond regarding the matter. In making the
> selection, the responding entity must designate a
> person or persons "who consent to testify on its
> behalf," and it may "set out the matters on which each
> person designated will testify." Once that designation
> is accomplished the rule says that "[t]he persons
> designated must testify about information known or
> reasonably available to the organization."

<u>Id.</u> Thus, testimony elicited at the Rule 30(b)(6) deposition

"represents the knowledge of the corporation, not of the

individual deponents. <u>U.S. v. Taylor</u>, 166 F.R.D. 356, 361

(M.D.N.C. 1996). The duty to prepare a Rule 30(b)(6) designee

has been succinctly described by Magistrate Judge Eliason of the

Middle District of North Carolina in <u>Taylor</u>:

> If persons designated by the corporation do not
> possess personal knowledge of the matters set out in
> the deposition notice, the corporation is obligated to
> prepare the designees so that they may give
> knowledgeable and binding answers for the corporation.
> <u>Dravo Corp v. Liberty Mutu. Ins. Co.</u>, 164 F.R.D. 70,
> 75, 75 (D. Neb. 1995)(citing <u>Marker</u>, 125 F.R.D. at
> 126). Thus, the duty to present and prepare a Rule
> 30(b)(6) designee goes beyond matters personally known
> to that designee or to matters on which that designee
> was personally involved. <u>Buycks-Robertson v. Citibank
> Federal Sav. Bank</u>, 162 F.R.D. 338, 343 (N.D.Ill.

1995); <u>S.E.C. v. Morelli</u>, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)

...

Rule 30(b)(6) explicitly requires [the entity] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires such persons to review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial.

<u>Id.</u> at 361-62; <u>see also</u> <u>International Ass'n of Machinists and Aerospace Workers v. Werner</u>, 390 F. Supp.2d 479, 487 (D. Md. 2005)(quoting <u>Taylor</u>, 166 F.R.D. at 361); <u>Paul Revere Life Ins. V. Jafari</u>, 206 F.R.D. 126, 127-28 (D. Md. 2002) (quoting <u>Taylor</u>, 166 F.R.D. at 361-62).

Reviewing the transcript of Mr. Broderick's deposition, it is abundantly clear the he was woefully unprepared. His testimony indicates that few (or likely no) steps were taken prepare for his deposition:

Q. With respect to number 18, "Costs incurred by you in pursuing the lawsuits," what inquiry did you undertake to determine that you are the person that can respond to questions on that topic -- on behalf of The Resolution Law Group.

A. I didn't do any inquiry. I just figured you had if you had any concerns about it, you'd discuss it with me, like the other questions.
...

Q.   Number 32 "the maintenance of your books and
records, including without limitation documents and
email retention and destruction policies." What
inquiry did you undertake that you were the best
person to respond to questions on that topic?

A.   I did not inquire into that, I'm sorry.

Q.   You didn't make any inquiry. You don't know if
there's any document retention policy, you've
testified to that earlier; correct?

A.   Right, that's correct.

Q.   And you don't know where, if at all, The
Resolution Law Group maintains business records?

A.   That's correct.

(Id. at 36, 40).   Moreover, with regard to several specifically

noticed topics, such as (17) "Payments from plaintiffs of the

lawsuits [against First Mariner] and the terms of engagement,"

and (22) "your offices, including staff, support, and record

keeping," Mr. Broderick lacked even basic knowledge regarding

RLG as an organization, for example:

Q.   You don't have a file for Mr. Abraham?

A.   I don't know the extent to which Mr. Abraham has
a file
...
Q.   And you don't know where, if at all, The
Resolution Law Group maintains business records?

A.   That's correct.

(Id. at 39, 40).   It defies logic that Mr. Broderick, the owner

and founder of RLG, could possess as little knowledge and

37

understanding of RLG's operations as his deposition testimony would suggest. Accordingly, the Court finds that Defendants failed to satisfy their duty to present a prepared Rule 30(b)(6) witness for deposition.

Turning to the issue of sanctions, Rule 37(d) permits courts to impose sanctions against a party if a "person designated under Rule 30(b)(6)...fails, after being served with proper notice, to appear for that person's deposition." "Producing an unprepared witness is tantamount to a failure to appear." Taylor, 166 F.R.D. at 362 (citing Resolution Trust Corp. v. Southern Union, 985 F.2d 196, 197 (5th Cir. 1993)); International Ass'n of Machinists, 390 F. Supp.2d at 489-90 (awarding sanctions pursuant to Rule 37(d) for failure to present a prepared 30(b)(6) witness). Pursuant to Rule 37(d)(3), "[s]anctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)" and "[i]nstead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Accordingly, the Court finds an award of reasonable expenses including attorney's fees would seem mandatory, see International Ass'n of Machinists, 390 F. Supp.2d at 489, and other additional

sanctions are likewise warranted. However, as noted supra, Court will address all of Defendants' sanctionable conduct before turning to what sanctions are appropriate at this stage of the case.

### iii.  Failure to Respond to Interrogatories

Lastly, Plaintiff's motion for sanctions seeks appropriate sanction for Defendants' failure to respond to Plaintiff's November 22, 2013, interrogatories. (ECF No. 238-1, 16-17). Defendants offer little by way of response to Plaintiff's motion, stating only "Defendants have answered [P]laintiff's most recent set of interrogatories. There are currently no interrogatories to which answers have not been provided." (ECF No. 246). In fact, Defendants served their responses to Plaintiff's interrogatories contemporaneously with their opposition to the present motion, on March 21, 2014. (ECF No. 251-1; ECF No. 251-2). As such, Defendants' responses were served nearly four months, to the day, after Plaintiff's interrogatories were first served (and were served only after Plaintiff filed a motion for sanctions).[6]

Having considered Plaintiff's interrogatories and Defendants' responses and objections, the Court finds Defendants' response inadequate. The November 22,

---

[6] Fed. R. Civ. P. 33(b)(2) requires that the responding party serve its answers and objections to interrogatories within 30 days after being served, absent a stipulation pursuant to Rule 29 or a court order.

interrogatories request relevant information. The profits and revenue generated from the advertisements, as well as the costs incurred in pursuing the lawsuits against Plaintiff, are relevant to Plaintiff's false advertising claim and Plaintiff is entitled to responses. In some cases Defendants asserted boilerplate objections, which, by themselves, can act as a waiver and compels answers. Mezu v. Morgan State University, 269 F.R.D. 565, 573-4 (D. Md. 2010). It is never enough for a party resisting discovery to simply proclaim irrelevance, but must "explain precisely why its objections are proper." United Oil Co., Inc. v. Parts Assocs., Inc., 227 F.R.D. 404, 409 (D. Md. 2005). Moreover, Defendants respond evasively to the specific questions asked by Plaintiff's interrogatories. For example, with regard to the interrogatories directed to Mr. Broderick:

> 21. State the amount of revenue generated from the April Advertisement, the May Advertisement, and any other Advertisements or promotional publications that reference Plaintiff in any manner and identify all documents reflecting such revenue.

(ECF No. 238-5, 7). After interposing various boilerplate objections, Mr. Broderick responded that "this defendant has not received any such revenue." (ECF No. 251-1, 4). This response clearly does not address what is actually asked in the interrogatory. Mr. Broderick was not asked what revenue he

40

"personally" received. Mr. Broderick's responses to the additional two interrogatories are equally evasive. Defendant RLG's responses to identical interrogatories are more informative, providing some information as to revenue generated from mailers and costs incurred in pursuing the lawsuits involving First Mariner. (ECF No. 251-2, 4-6). However, Defendants decline to identify any documents reflecting the figures described for revenues and costs or describe the elements of costs or deductions claimed. (Id.) Thus, Defendants' incomplete responses, provided only after the threat of Plaintiff's motion for sanctions, require further elaboration to be truly adequate.

Fed. R. Civ. P. 37(d) likewise authorizes imposition of the sanctions listed in Rule 37(b)(2)(A)(i)-(vi) for a party's failure to respond to interrogatories and further mandates an award of fees unless the party's failure to respond was substantially justified or other circumstances make an award of fees unjust.

The Court shall now turn to address the issue of appropriate sanctions.

**B. Sanctions**

Courts may order dismissal or judgment by default "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice

or undermines the integrity of the process." Projects Mgmt, 734 F.3d at 366 (quoting Shaffer Equip., 11 F.3d at 462). Courts' authority to impose sanctions against a party, up to and including default or dismissal, derives from two primary sources. First, if a party violates a court order or disrupts the court's discovery plan, Fed. R. Civ. P. 37 grants courts wide discretion to impose sanctions, including default. Mutual Fed. Sav., 872 F.2d at 92; Anderson, 155 F.2d at 504. However, when the sanction involved is judgment by default, the court's "'range of discretion is more narrow' because the district court's desire to enforce its discovery orders is confronted head-on by the party's rights to a trial by jury and a fair day in court." Mutual Fed. Sav., 872 F.2d at 92 (quoting Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 503-04 (4th Cir. 1977)). Accordingly, these competing interests require the consideration of a four-part test:

> (1) Whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions.

Id.; Anderson, 155 F.2d at 504. Second, "due to the very nature of the court as an institution it must and does have an inherent power to impose order, respect, decorum, silence, and compliance

with lawful mandates," which includes the authority to order default or dismissal. Projects Mgmt, 734 F.3d at 373 (quoting Shaffer Equip., 11 F.3d at 462). Yet, before exercising its inherent power to assess the "most extreme sanctions," i.e. dismissal without considering the merits or entry of judgment by default, a court must similarly weigh the following factors:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

Projects Mgmt., 734 F.3d at 373-74 (quoting Shaffer Equipment, 11 F.3d at 462-63).

Plaintiff has urged the Court to impose the severe sanction of entry of default judgment as to liability on all counts of the amended complaint —— Count I (Lanham Act violations, namely false advertising), Count II (defamation), and Count III (unfair competition). Having considered Defendants' history of egregious discovery misconduct coupled with Defendants' latest bad faith discovery abuse, in particular Defendants' clear spoliation of evidence, the Court agrees that judgment by default as to liability for all counts of Plaintiff's amended complaint is warranted.

43

Here, Defendants' discovery misconduct implicates both the Court's inherent power to uphold the integrity of the judicial process (due to Defendants' spoliation) and the Court's authority, pursuant to Fed. R. Civ. P. 37, to control discovery (due to defendants repeated failure to comply with discovery orders, including most recently, failure to present a prepared Rule 30(b)(6) witness and failure to respond to interrogatories). As such, the Court has considered the related factors for assessing the sanction of default judgment in these contexts and finds that they overwhelmingly support such a sanction here.

Defendants have repeatedly demonstrated their bad faith throughout discovery in this case. As exhaustively recounted herein, Defendants have obfuscated and obstructed discovery since its inception, most recently through Mr. Broderick's woefully inadequate deposition, Defendants' failure to respond for four months to Plaintiff's November 22, interrogatories (Defendants' actual responses necessitating supplementation), and (most egregiously) spoliation of Mr. Broderick's computer and smartphone.[7] As a result, Plaintiff has been manifestly

---

[7] The Court also acknowledges herein that, at bottom, Mr. Broderick's bad faith spoliation of his laptop and smartphone, alone, would be a sufficient basis to order the sanction of default judgment as to Counts I (Lanham Act violations, namely false advertising) and III (unfair competition). "The harshest sanctions may apply not only when both severe prejudice and bad faith are present, but also when, for example, culpability is minimally present, if there is a considerable showing of prejudice, or, alternatively, the prejudice is minimal but the culpability is great" Victor Stanley, 269

prejudiced, both through undue delay and increased expense[8] and inability to obtain evidence necessary to present its case. Likewise, the need for deterrence here is great, "[t]o find otherwise would be to send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling." Mutual Fed. Sav., 872 F.2d at 94. Defendants have already been subject to numerous sanctions, including attorney's fees and expenses totaling $25,721.00, adverse jury instructions, and preclusion of additional evidence at trial regarding specific issues. Further, the Court has specifically warned Defendants in no uncertain terms and as early as June 13, 2013, that

F.R.D. at 533; Silvestri, 271 F.3d at 593 (finding that severe sanctions, including dismissal, are "usually justified only in circumstances of bad faith or other 'like action' ... [b]ut even when conduct is less culpable, dismissal may be necessary if the prejudice to the [non-spoliating party] is extraordinary, denying it the ability to adequately defend [or present] its case") (citing Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998)). Here, culpability and prejudice—as to Plaintiff's false advertising and unfair competition claims—are great. Defendants acted with bad faith in destroying the only identified source of records pertaining to the operations of RLG and whether Defendants ever intended or was capable of pursuing a bona fide lawsuit on behalf of the recipients of the mailers it distributed.

[8] See Anderson, 155 F.3d at 503-04 (affirming the district court's sanction of default judgment, finding that the defendants had "stonewalled discovery from the inception of the lawsuit," and prejudiced the plaintiff through increased expense, annoyance, and delay in prosecuting the case); Daye v. General Motors Corp., 172 F.R.D. 173, 176-78 (M.D.N.C. 1997)(entering the sanction of dismissal with prejudice following the plaintiff's repeated failure provide discovery and meet deadlines); Aerodyne Systems Eng., Ltd v. Heritage Int'l Bank, 115 F.R.D. 281, (D. Md. 1987)(entering the sanction of dismissal with prejudice, finding "[t]here is no doubt that Aerodyne's delinquent and inadequate interrogatories and document responses have resulted in prejudice to Heritage by preventing it from conducting discovery, evaluating the merits of the claims against it, and from adequately preparing its defense in this matter. Furthermore, Heritage has been put to considerable additional time and expense of preparing several motions to compel discovery.").

continued discovery abuse could lead to entry of default Judgment. (ECF No. 121); see Anderson, 155 F.3d at 504 (acknowledging that a Court must make the threat of default judgment clear) (citing Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d 36, 40 (4th Cir. 1995)). Defendants' discovery misconduct, however, has continued unabated. Clearly, lesser sanctions have not been an effective deterrence for these Defendants.

Discovery in this case has been ongoing for 16 months and due to Defendants' repeated and ongoing discovery misconduct, this case has taken up an inordinate amount of judicial resources, and resulted in significant procedural and substantive prejudice to Plaintiff. The Plaintiff has been stymied at every turn – written discovery, depositions, subpoenas – to get the evidence it needs to prosecute its claims. Plaintiff has been forced to engage in largely futile negotiations with Defendants' seriatim counsel and, expensive, and distracting motions practice in an attempt to get the discovery to which it is entitled and which it needs. Accordingly, I recommend the sanction of judgment by default as to liability on all counts of the amended complaint —— Count I (Lanham Act violations, namely false advertising), Count II (defamation), and Count III (unfair competition). The facts of this case speak so clearly to Defendants' egregious misconduct

that judgment by default as to all counts of the amended complaint is both necessary to uphold the integrity of the judicial process and squarely within the Court's discretion.

## C. Default Judgment

### i. Standing

Defendants principally argue in opposition to Plaintiff's motion for sanctions that this Court cannot enter a default as to Counts I (Lanham Act, namely false advertising) and III (unfair competition) because Plaintiff lacks standing to bring those claims. (ECF No. 246, 2-12). Defendants, however, have already challenged Plaintiff's standing to bring Counts I and III in prior motions to dismiss (ECF No. 36, 42). Judge Garbis has ruled on Defendants' motions to dismiss, denying them as to all counts, including Defendants' challenges to standing. (ECF No. 60, 21-25). However, because the Court has reasoned that the sanction of judgment by default is necessary, the Court shall address the assertions raised in Defendants' opposition to the present motion and consider whether Plaintiff rightly has standing to make Lanham Act and Maryland unfair competition claims against Defendants.

First, the Court quickly rejects Defendants' challenge to Plaintiff's unfair competition claim, Count III, as Judge Garbis has clearly ruled on this issue. Defendants' opposition to the present motion for sanctions re-raises Defendants' contention

that Plaintiff and Defendants are not competitors, and thus, Plaintiff lacks standing to pursue a Maryland unfair competition claim. (ECF No. 246, 10-15). Judge Garbis, however, has held as follows:

> Under Maryland law, a plaintiff need not be in competition with the defendant to have standing to pursue an unfair competition claim. See, e.g., Cloverleaf Enters. v. Md. Thoroughbred, Horsemen's Ass'n., 730 F. Supp. 2d 451, 467 (D. Md. 2010) (denying motion to dismiss unfair competition claim by racetrack owner against horsemen and jockeys); Sun Dun, Inc. of Wash. v. Coca Cola Co., 740 F. Supp. 381, 397 (D. Md. 1990) (denying motion to dismiss unfair competition claim by vendor against drink manufacturer and distributor).
>
> Therefore, First Mariner's unfair competition claim will not be dismissed for lack of standing.

(ECF No. 60, 24-25). Defendants have not cited any recently decided Maryland case law as a basis for the reconsideration of Judge Garbis' decision, Defense counsel acknowledged as much during this Court's April 9, 2014, hearing on the present motion (ECF No. 253). Accordingly, Defendants' second effort at obtaining dismissal of Plaintiffs' unfair competition claim is rejected.

Second, Defendants challenge Plaintiff's standing to maintain a false advertising claim pursuant to the Lanham Act, 15 U.S.C. § 1125(a), similarly, because Plaintiff and Defendants are not competitors. (ECF No. 246, 2-10). This issue was

likewise before Judge Garbis on motions to dismiss. (ECF No. 60). In deciding Defendants' prior motions, Judge Garbis acknowledged that the federal circuits which have addressed this issue have differing views as to the necessity of a "competition" component to establish a Lanham Act claim. (Id. at 21). Judge Garbis went on to explain that various circuits have adopted varying "tests" to assess whether a plaintiff has standing to bring a Lanham Act claim, each informed, in part, by the circuit's view as to the "competition" component. (Id. at 21-22) (collecting cases). Although, perhaps providing a hint of its views in dicta, the Fourth Circuit had not definitively addressed the matter and district courts within the Fourth Circuit have taken varying approaches to the issue.[9] (Id. at 22-23). Ultimately, Judge Garbis determined that "[i]n view of the absence of clear binding precedent and the evidentiary interrelationship between the defamation and Lanham Act claims, the Court will not dismiss the Lanham Act claim on standing grounds. However, the standing issue will be considered in due course at later stages of the instant case." (Id. at 24). That later stage, as contemplated by Judge Garbis, has arrived. As

---

[9] See Made in the USA Found. v. Phillips Food, Inc., 365 F.3d 278, 280 (4th Cir. 2004); See also, e.g., Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 564 F. Supp.2d 544, 551-53 (E.D. Va. 2008) aff'd, 591 F.3d 250 (4th Cir. 2009)(declining to resolve the proper standing analysis); e.g., Va. Polytechnic Inst. & State Univ. v. Hokie Real Estate, Inc., 813 F. Supp. 2d 745, 757 (W.D. Va. 2011); e.g., Coulibaly v. J.P. Morgan Chase Bank, N.A., No. DKC 10-3517, 2011 WL 3476994, at *13 (D. Md. Aug. 8, 2011).

such, Defendants have extensively analyzed and discussed the cases considered by Judge Garbis, including those in this Circuit. (ECF No. 246, 2-10). However, On March 25, 2014, the Supreme Court decided Lexmark Int'l, Inc. v. Static Control Components, Inc., No 12-873, slip op., 572 U.S. ___ (U.S. March 25, 2014), directly addressing the standing issue under the Lanham Act, 15 U.S.C. § 1125(a).

In Lexmark, the Supreme Court considered whether Static Control ("the market leader in making and selling the components necessary to remanufacture Lexmark [printing] cartridges") had standing to maintain a Lanham Act claim against Lexmark (a manufacturer and seller of laser printers) for false advertising. Id. at slip op. 1-2, 4. Static Control alleged that Lexmark (1) through advertisements for its "prebate program," purposefully mislead end-users to believe that they are legally bound by the prebate-terms and are thus required to return prebate-labeled cartridges to Lexmark after a single use; and (2) sent letters to most companies in the toner remanufacturing business falsely advising that it was illegal to sell refurbished prebate-cartridges and, in particular, that it was illegal to use Static Control's products to refurbish those cartridges. Id. at 3. In granting certiorari, the Court addressed the "appropriate analytical framework for determining a party's standing to maintain an action for false advertising

under the Lanham Act.'" Id. at 5-6 (quoting Pet. for Cert. i;
569 U.S. ___ (2013)). As such, the Court adopted the following
framework for analyzing statutory standing[10] under the Lanham
Act: (1) the statutory cause of action only extends to
plaintiffs whose interests fall within the "zone of interests"
protected by the Act; and (2) the statutory cause of action is
limited to plaintiffs whose injuries are "proximately caused" by
violations of the Act. Id. at 10, 13. Justice Scalia, writing
for a unanimous Court, held that (1) "to come within the zone of
interests in a suit for false advertising under § 1125(a), a
plaintiff must allege an injury to a commercial interest in
reputation or sales;" and (2) "a plaintiff suing under § 1125(a)
ordinarily must show economic or reputational injury flowing
directly from the deception wrought by the defendant's
advertising; and that that occurs when deception of consumers
causes them to withhold trade from the plaintiff." Id. at 13,
15.

Applying this standard to the case before it, the Court
determined that Static Control rightfully had standing to sue
Lexmark under § 1125(a). Id. at 18. First, Static control was
"suing not as a deceived consumer but as a 'person engaged in'

---

[10] Although the parties briefed the issue as one of "prudential standing," the
Court determined the question presented by the case was more appropriately
referred to as an issue of "statutory standing," i.e., whether Static Control
falls within the class of plaintiffs which Congressed authorized to sue under
§ 1125(a). Id. at 9 n.4.

'commerce within the control of Congress' whose position in the marketplace has been damaged by Lexmark's false advertising," thus, falling within the "zone of interest." Id. at 19. Second, "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)." Id. "When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements." Id. Static Control satisfied the proximate cause element of standing by sufficiently alleging that Lexmark disparaged its business by asserting that Static Control's business was illegal. Id.

Plaintiff's claim as set forth in the amended complaint fits snugly within the Lexmark framework, establishing standing under the Lanham Act. First, Plaintiff has alleged that as a result of Defendants' false advertising, Plaintiff "has incurred, and likely will continue to incur, substantial commercial injury in the form of lost sales, loss of market share, and damage to reputation and good will." (ECF No. 31, ¶ 37). Further, Plaintiff has alleged that Defendants' mailers disparaged, and continue to disparage, Plaintiff's business and goodwill by confusing and deceiving Plaintiff's customers into believing that Plaintiff has engaged in unlawful, deceptive and

fraudulent lending practices. (Id. at ¶¶ 33, 37). Although the
Lexmark decision was not published until after Defendants filed
their opposition to Plaintiff's motion for sanctions, Defendants
were given the opportunity to discuss the implications of
Lexmark during this Court's April 9, 2014, hearing (ECF No.
253), and did so. Having considered the allegations in
Plaintiff's amended complaint, the Court finds that Plaintiff
has alleged standing to pursue its false advertising claim under
the Lanham Act.

### ii. Entry of Default Judgment

Finally, Defendants assert that this Court cannot assess
the sanction of judgment by default, because Plaintiff's amended
complaint fails to allege a concrete or liquidated amount of
damages. (ECF No. 246, 1-2). The Court disagrees. In
reviewing a motion for entry of default judgment, the Court
accepts as true the well-pleaded factual allegations in the
complaint as to liability. Ryan v. Homecomings Fin. Network,
253 F.3d 778, 780-81 (4th Cir. 2001). If the Court determines
that liability is established, it must then determine the
appropriate amount of damages. Ryan, 253 F.3d at 780-81.
Unlike allegations of fact establishing liability, the Court
does not accept factual allegations regarding damages as true,
but rather must make an independent determination regarding such
allegations. See Credit Lyonnais Secs. (USA), Inc. v.

<u>Alcantara</u>, 183 F.3d 151, 154 (2nd Cir. 1999).  In so doing, the Court may conduct an evidentiary hearing.  Fed. R. Civ. P. 55(b)(2).  The Court may also make a determination of damages without a hearing as long as there is an adequate evidentiary basis in the record for the award.  <u>See</u>, <u>e.g.</u>, <u>Stephenson v. El-Batrawi</u>, 524 F.3d 907, 917 n.11 (8th Cir. 2008) ("Foregoing an evidentiary hearing may constitute an abuse of discretion when the existing record is insufficient to make the necessary findings in support of a default judgment."); <u>Adkins v. Teseo</u>, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) (finding that a court need not make determination of damages following entry of default through hearing, but rather may rely on detailed affidavits or documentary evidence to determine the appropriate sum).

Accordingly, it is the undersigned's recommendation that, pursuant to Fed. R. Civ. P. 55(b)(2), that an evidentiary hearing be held to give Plaintiff the opportunity to prove its damages, or, alternatively, give the parties the opportunity to submit briefing (which is to include detailed affidavits or documentary evidence) to permit the Court to determine the appropriate sum of damages.[11]

---

[11] Also to be considered through briefing or at an evidentiary hearing is the issue of attorneys' fees and costs flowing from Defendants' failure to respond to interrogatories or prepare a Rule 30(b)(6) designee for deposition, <u>see</u> Fed. R. Civ. P. 37(d)(3), allowing consideration of whether the circumstances exist which would make an award of expenses unjust.

## III.  Conclusion

Having considered Plaintiff's motion for sanctions (ECF No. 238), it is hereby RECOMMENDED that:

1. Plaintiff's motion for sanctions be GRANTED;

2. Judgment by default be entered against Defendants as to all counts of Plaintiff's amended complaint;

3. The Court hold an evidentiary hearing, pursuant to Fed. R. Civ. P. 55(b)(2) in order to give Plaintiff the opportunity to prove its damages, or, alternatively, the parties be given the opportunity to submit briefing (which is to include detailed affidavits or documentary evidence) in order to permit the Court to determine the appropriate sum of damages.

Date:  __4/22/2014__                    _____/s/_____
                                        Susan K. Gauvey
                                        United States Magistrate Judge